**WICHITA FALLS, R. & FT. W. RY. CO. et al. v. EMBERLIN. (No. 10322.)**

(Court of Civil Appeals of Texas. Fort Worth. June 23, 1923. Rehearing Denied Oct. 27, 1923. Writ of Error Granted Nov. 21, 1923.)

**1. Trial ☞352(5)—Special issues held not to imply legal duty to give signals.**

Special issues whether bell and whistle of locomotive as it was run into the station were sounded at such distance as to give deceased notice of its approach *held* not open to the objection of implying the legal duty to give such signals. ˋ

**2. Appeal and error ☞218(2)—Objection first made on appeal to form of special issues too late.**

Objection that special issues whether signals were given at such distance as to give deceased warning of the approach of the locomotive should have been as to warning persons of ordinary prudence, with average ability to hear and notice the approach, should, under Complete Tex. St. or Vernon's Sayles' Ann. Civ. St. 1914, art. 1971, have been seasonably made to the trial judge, and, being made on appeal for the first time, is too late.

**3. Appeal and error ☞1062(2)—Refusal of special issue harmless in view of finding.**

Refusal of special issue based on testimony that deceased ran in front of the locomotive, and slipped as he reached the second track, was harmless; the jury having found he did not run around the engine, making it clear that they discredited witnesses giving such version of the accident.

**4. Railroads ☞396(1)—Man going on track presumed possessed of faculties and ability to appreciate danger.**

A man struck by locomotive just as he stepped on the track will, in the absence of any proof to the contrary, be presumed to have been possessed of the same faculties for hearing and seeing, and the same knowledge, experience, and ability to appreciate danger, which is possessed by the ordinary man of his age.

**5. Railroads ☞383(1)—Man struck by locomotive as he stepped on track shown contributorily negligent.**

That deceased, struck by a locomotive as he stepped on the track, was guilty of contributory negligence, *held* conclusively established by the undisputed testimony, in connection with unchallenged findings that he neither looked nor listened for the train, which could have been seen for half a mile.

**6. Trial ☞350(7)—On issue of discovered peril, defendant entitled to special issue whether deceased was run over by locomotive.**

There being conflicting evidence as to whether deceased was killed when first struck by the locomotive, by being run over by its front drive wheel, or later by being struck by the rear truck of the tender, and there being insufficient evidence that after the engineer discovered deceased's peril he had time to stop the engine before deceased was killed if the front drive wheel killed him, defendant was entitled, on the issue of discovered peril, to have submitted the special issue, "Did the drive wheels of the engine run over and kill * * * deceased?" it not being merely of evidentiary character.

**7. Evidence ☞77(1)—Defendant's failure to produce witnesses raises no presumption in plaintiff's favor on issue of discovered peril.**

The burden being on plaintiff to sustain the affirmative of the issue of discovered peril, failure of defendant to produce as witnesses the operatives of the locomotive which struck deceased raises no presumption in plaintiff's favor on that issue.

**8. Witnesses ☞321—Party taking and introducing deposition vouches for credibility of witness.**

Plaintiff by taking depositions and introducing parts of them in legal effect vouches for credibility of witness.

On Motion for Rehearing.

**9. Railroads ☞398(4)—Discovered peril cannot be proved by mere inference or presumption.**

While discovered peril, allowing recovery notwithstanding contributory negligence, may consist, in part, at least, of circumstantial evidence, such evidence must be of facts, and not merely of inferences or presumptions, as the presumption that the engineer, because it was his duty to exercise ordinary care to keep a proper lookout, saw deceased when he stepped on the track.

**10. Railroads ☞395—Defense to discovered peril admissible under general denial.**

Relative to the issue of discovered peril, defense that deceased was killed when first struck by the locomotive, rather than later by the baggage car, as testified by several of plaintiff's witnesses, was admissible under defendant's general denial, without necessity of specially pleading it.

Appeal from District Court, Stephens County; W. R. Ely, Judge.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by Mrs. Mattie Emberlin against the Wichita Falls, Ranger & Fort Worth Railway Company and others. From a judgment for plaintiff, the named defendant and another appeal, and defendant Fort Worth & Rio Grande Railway Company appeals from a judgment over against it in favor of the named defendant. Reversed and remanded for a new trial as between plaintiff and appellants.

Thompson, Barwise, Wharton & Hiner, Levy & Evans, and Goree, Odell & Allen, all of Fort Worth, and John F. Evans and McCartney, Foster & McGee, all of Breckenridge, for appellants.

W. C. Jackson and W. A. Shields, both of Breckenridge, and W. E. Martin, of Abilene, for appellee.

DUNKLIN, J. The Wichita Falls, Ranger & Fort Worth Railway Company and the Fort Worth & Rio Grande Railway Company have appealed from a judgment rendered in favor of Mrs. Mattie Emberlin for $20,000 as damages for the death of her husband, R. L. Emberlin, which was alleged to have occurred as the result of the negligence of those two defendants, and the Fort Worth & Rio Grande Railway Company has also appealed from a judgment over against it in favor of its codefendant, Wichita Falls, Ranger & Fort Worth Railway Company, for all sums that the latter company may be compelled to pay in satisfaction of the amount awarded to the plaintiff.

The Fort Worth & Rio Grande Railway Company owns and operates a railway line from the city of Fort Worth to the town of Dublin and the Wichita Falls, Ranger & Fort Worth Railway Company owns and operates a line of railway from Dublin to and through the town of Breckenridge. The St. Louis, San Francisco & Texas Railway Company was also made a defendant, but judgment was rendered in its favor, and, as no complaint is made of that judgment, that company will not be further noticed in this opinion.

It was alleged in plaintiff's petition that there was some arrangement between all three of the defendants under and by virtue of which the operatives of the trains over the Wichita Falls, Ranger & Fort Worth Railway Company from Dublin to Breckenridge were the agents and servants of each and all of the defendants; that such arrangement was unknown to the plaintiff, but was well known to the defendants, and they were given notice to produce upon the trial of the case the written contract showing the nature of such agreement.

At the railway passenger station in the town of Breckenridge a board walk about 5 feet wide was constructed, running lengthwise with the railway track, and on the east side of the east rail, about 20 inches from that rail. That walk constituted a part of the passenger platform, although the surface of the ground between that walk and the passenger station building about 30 feet distant was uncovered. At about 8 o'clock on the morning of February 3, 1921, a number of people had gathered at the station to await the incoming of a passenger train from Dublin, and were standing on the board walk. Quite a number of trucks and automobiles were also standing alongside the track to the south of the board walk, from which direction the train approached. R. L. Emberlin was on the board walk, and when the train came in he was struck by the locomotive just as he was in the act of stepping on or over the east rail. He was struck by the pilot of the locomotive, and in falling he attempted to grab hold of the pilot, but was unable to do so, and fell to the ground alongside the east rail. In attempting to extricate himself from that position by getting up from the ground his head was struck either by one of the drive wheels of the locomotive or by the journal box of the rear truck of the tender, and he was killed.

In plaintiff's petition it was alleged that the death of Emberlin was proximately caused by the negligence of the defendants in failing to ring the bell of the engine and in failing to blow the whistle as the train approached the station. It was also alleged that the operatives of the train were guilty of negligence in failing to stop or check the speed of the locomotive after the operatives in charge of it had discovered Emberlin's peril, and that such negligence was also the proximate cause of his death. The defendants pleaded specially that Emberlin was guilty of negligence proximately contributing to his injury, which would defeat a recovery for his death, in failing to discover the approach of the train by looking or listening; that the train as it approached was in plain view of the deceased; that he should have known of such approach; and that he was guilty of negligence in walking into or in front of it when he knew, or by the exercise of ordinary care should have known, of its near approach to him.

The case was tried before a jury, and the following are the special issues submitted, with the findings of the jury thereon:

"1. Did the operatives of said locomotive on the occasion in question ring the bell of said locomotive as they ran said locomotive into the station at Breckenridge, Tex., within such distance from said station as to give the deceased notice of the approach of said locomotive? Ans. No.

"2. If you have answered the foregoing question in the negative, then state: State if such failure to ring the bell, if there was any such failure, was 'negligence' as that term is herein defined? Ans. Yes.

"3. If you have answered the foregoing ques-

tion in the affirmative, then answer: Was the failure to ring the bell the 'proximate cause' of the death of the deceased? Ans. Yes.

"4. Did the operatives of said locomotive, on the occasion in question, blow the whistle of said locomotive as they ran the said locomotive into the station at Breckenridge, Tex., within such distance from said station as to give the deceased notice of the approach of said locomotive? Ans. No.

"5. If you have answered the foregoing question in the negative, then state: Was such failure to blow the whistle, if there was a failure to blow the whistle, 'negligence' as that term is herein defined? Ans. Yes.

"6. Was the failure to blow the whistle, if you have found in answer to question No. 4 that the operatives of said locomotive did fail to blow said whistle, the 'proximate cause' of the death of the deceased? Ans. Yes.

"7. Did the operatives of the locomotive, or either of them, at the time in question, see the deceased and know of his peril in time that they could, by the use of the means at hand, and with safety to the locomotive and train, have stopped the same in time to have avoided killing the deceased? Ans. Yes.

"8. If you have found, in answer to the foregoing question No. 7, that the operatives of the locomotive, or either of them, at the time in question, saw the deceased and knew of his peril in time that they could, by the use of the means at hand and with safety to the locomotive and train, have stopped the same in time to have avoided killing the deceased, then state whether or not such failure upon their part to so stop the train was negligence as that term has been defined herein? Ans. Yes.

"9. What amount of money, if paid now in cash, will reasonably compensate the plaintiff, Mrs. Mattie Emberlin, for the damages she has sustained, if any, occasioned by the death of her husband? Ans. $20,000."

The jury also found answers to the following requested issues:

"Special issues requested by the defendant, Fort Worth & Rio Grande Railway Company:

"At the time and place of said accident, were the operatives in charge of said train under the control and direction of the defendant Fort Worth & Rio Grande Railway Company? Ans. Yes.

"At the very time of the accident was the engineer, Vaughn, under the control and direction of the Fort Worth & Rio Grande Railway Company as to the method, means, and manner of his work at that time? Ans. Yes.

"Special issues requested by all the defendants:

"Did the deceased, R. L. Emberlin, on the occasion in question, without exercising ordinary care for his own safety, walk or step into or against any part of the approaching train? Ans. No.

"If you answer the above question, then state whether said act or acts of the deceased, R. L. Emberlin, if any, proximately caused or proximately contributed to cause his injury and death? Ans. No.

"Did the said R. L. Emberlin see the approach of the train in question before he went on the railroad track at the time in question? Ans. No.

"If you have answered the foregoing question in the affirmative, then did the said Emberlin exercise ordinary care for his safety in going on said railroad track? Ans. Yes.

"If you have answered the foregoing two questions in the affirmative, then did the failure of the said Emberlin to exercise such ordinary care for his safety if he did so fail proximately cause or contribute to his injury and death? Ans. No.

"Did the deceased, R. L. Emberlin, as he approached the railroad track in question where the collision occurred, listen for an approaching train? Ans. No.

"If you have answered the above and foregoing question in the negative, then state whether the said R. L. Emberlin, deceased, was guilty of negligence in failing to listen as he approached said track, if he did so fail. Ans. No.

"If you have answered the above and foregoing questions in the affirmative, then state whether such negligence, if any, on the part of the said R. L. Emberlin, deceased, concurred directly and proximately to cause his death. Ans. No.

"Did the deceased, R. L. Emberlin, look for an approaching train before going on the railroad track at the time of said accident? Ans. No.

"If you have answered the foregoing question in the affirmative, then was such failure, if any, a lack of ordinary care on the part of the said Emberlin for his safety? Ans. No.

"If you have answered the foregoing two questions in the affirmative, did such lack of ordinary care, if any, on the part of the said Emberlin proximately cause or contribute to his injury and death? Ans. No.

"Did the deceased, R. L. Emberlin, on the occasion in question, attempt to pass in front of a moving train? Ans. No.

"If you have answered the above and foregoing question in the affirmative, then state whether such act, if any, on the part of the said R. L. Emberlin, deceased, was a failure on his part to exercise ordinary care for his own safety? Ans. No.

"If you have answered the above and foregoing questions in the affirmative, then state whether such failure on the part of said R. L. Emberlin, if any, proximately caused or contributed to cause his injury and death? Ans. No.

"Did the said R. L. Emberlin hear the approach of the train in question before he went on the railroad track at the time in question? Ans. No.

"If you have answered the foregoing question in the affirmative, then did the said Emberlin exercise ordinary care for his own safety in going on said railroad track? Ans. Yes.

"If you have answered the foregoing question in the affirmative, then did the failure of the said Emberlin to exercise ordinary care for his own safety, if he did so fail, proximately cause or contribute to his injury and death? Ans. No."

Upon that verdict judgment was rendered in plaintiff's favor against both appellants jointly and in favor of the Wichita Falls, Ranger & Fort Worth Railway Company

over against appellant Fort Worth & Rio Grande Railway Company on allegations that the operatives of the train at the time of the accident were not its servants.

[1] The record before us is exceedingly voluminous, and the briefs filed by counsel for all the parties cover more than 370 printed pages. It is practically impossible to discuss all the questions presented, and we will notice only those which we consider to be of controlling effect. We overrule the contention of appellants that issues Nos. 1 and 4, presenting the allegations of negligence with respect to the failure to ring the bell and blow the whistle, was upon the weight of the evidence, in that such instruction implied the legal duty to give such signals as the train approached the station, in the absence of any statutory requirement to that effect. The inquiry in each instance was whether or not the signals mentioned were given within such distance from the station as to give the deceased notice of the approach of the train. The questions in no sense implied that such was the duty of the operatives of the locomotive, and the questions following those issues properly submitted to the jury the issues as to whether or not the failure to give such signals was negligence.

[2] A further contention is made that the issues with respect to the failure to ring the bell and blow the whistle were erroneous in that the inquiry was whether or not such signals should have been given at such distance as to have warned the deceased of the approach of the train, rather than as a warning to persons of ordinary prudence and with average ability to hear and notice the approach of the train. This contention is overruled, since that particular objection to the charge was not presented to the trial judge, and the objection is made in this court for the first time. Tex. Complete Statutes, art. 1971.

[3] Three of appellants' witnesses, Mc-Lean, Campbell, and Bird, testified that the deceased attempted to run around the engine from the west side to the east side of the track, and as he reached the east rail his foot slipped, and he was thereby caused to fall. Appellants specially pleaded contributory negligence on the part of Emberlin in that he slipped and fell while in close proximity to the engine. The court refused a requested issue as to whether or not the deceased slipped and fell at the time he came in contact with the engine, and, if so, whether or not such fall was the result of his failure to exercise ordinary care for his own safety. The assignments of error to the refusal of these requested issues are predicated upon the testimony of the witnesses just mentioned, and the same are overruled, since the jury found that the deceased did not run around in front of the engine as the three witnesses referred to testified. From

the finding it is clear that the jury discredited the version of the accident as given by those three witnesses, and accepted the testimony of numerous other witnesses to the effect that the deceased was struck just as he was attempting to cross the track from the east side, and when he stepped upon the east rail of the track.

E. A. Lauck, witness for plaintiff, testified that he was present at the time of the accident; that the pilot, or cowcatcher struck the deceased just as he was in the act of stepping on or across the east rail of the track; that after he was struck he tried to grab hold of the pilot, and remained on it until it moved about 20 feet, when he rolled off and fell on the ground alongside the track. He further testified:

"I saw him fall down by the east side of the track; the engine was still going at that time; he laid there and he tried to raise up, and as he was raising up on his hands and elbows in a sitting position the journal box hit him. When I saw he was going to raise I knew he was going to get hurt, and I ran to him to jerk him back. I did not reach him. I was stooping over to take hold of him when it struck him. I saw it when it hit him. It hit him right in the back of the head there. When it hit him it knocked the whole top of his head off."

Lauck further testified that he was an experienced railroad man, and said:

"I know and can tell from my experience and observation around railroad engines and trains when the brakes are on. The brakes were first thrown on just as it struck him. From the time that train crossed Walker street there —from the time that engine first crossed Walker street until the man was hit and the woman screamed and the brakes went on they had never applied the brakes. I could tell when the brakes were applied, as I could hear the grinding. You could hear them slap when they came on, when they went to the wheels, and you could hear the air. I was familiar with those sounds. I have worked around these trains. The first or front journal box on the back trucks of the tender was what hit the man on the head and killed him. The head joined on the engine. The tender is about 40 or 50 feet long. The engine and tender together are about 70 or 80 feet long. It was the front journal box on the rear truck of the tender that hit the man on the head and killed him. The tender has a truck in front and one behind. The engine had passed the man and the tender had passed until the rear truck had reached him. Immediately this woman screamed, the brakes went on. After the brakes were applied the train moved about 4 or 6 feet. That train was going at the rate of about 4 to 6 miles per hour. It was just coasting. There had not been any difference in the speed of the train from the time the engine first came across Walker street up until the brakes were applied. From the time the cowcatcher first struck the man until the journal box hit him in the head and killed him the train ran all together between 80 and 100 feet. At the time he [deceased] raised up he did not appear to have been injured. When the

journal box hit him in the head he seemed to drop down on his side and face. At the time the train stopped the man was under the front end of the baggage coach that joins on the engine and tender. I·watched him trying to get hold; to get hold of; to grab on there.· He was trying to get hold of it. I kept watching. It looked like he was bound to get hold of it, or that it would stop or something. When I saw he was going to get hurt I ran up to pull him back. The engine was passing him while he was lying there. When I ran back there the engine had passed him. As to where he was when I turned and looked back again and saw him, ·I never did turn away. I could see him; he was in my sight all the time. When I stepped back to this lady at that particular instance, first, I did not think he was going to get hurt. When he was thrown there, and when he come out on the east there, I did not think he was going to get hurt. Then I looked and thought he was going to get hurt. The cab of the engine was just barely past him when I started up after him. It was about 35 feet from the cab of ·that engine back to that journal box on the back trucks. At that time this man was something like 35 or 40 feet from me. He was 35 or 40 feet in front of me."

Lauck further testified:

"The train that killed·him was the morning passenger train from Fort Worth. It came in somewhere around 8 o'clock in the morning. I observed that train that morning before it reached the station. I watched it come there. I watched it come through the cut. The cut is about one-half mile over south of the station. There is also a curve down there. The curve is below the cut. I was watching the train. I will tell the jury the position he was in at the time the cowcatcher or pilot hit him. He was just walking along, angling across the railroad in a northwest position, and he was just fixing to step across the track. He was in the act of stepping over the east rail of the track, and he was going in a northwest direction. I heard the train whistle for the station down there at the mile post. The milepost is about a mile from the station. That is the regular place for the train to whistle when it is coming into the station. The whistling of the train at the milepost was the first thing that attracted my attention. When I looked down there I could see the train plainly. The cut is around about one-half mile from the station. If you were out close to the track or on the track, there is a plain view for at lease one-half mile down the track; practically a straight track where anybody can look down there and see the train. Out there on that board walk you could see down there. It looked like he was stepping across the east rail with his left foot from the mark where he slipped there. The mark showed it to be his left foot with which he was stepping across the east rail. It showed in the front on the rail where his heel had slipped. I think he was putting out his left foot in the act of crossing the east rail when I first saw him; just in the act. As to it being true that before he got his left foot across the east rail he had been struck by the pilot of the engine, that is correct. I had seen him just about the minute or moment he was struck. From the position there when I first saw him there was nothing to obstruct his view of the engine after he got on the track. You could not see the engine until you got to the track, or almòst to the track, on account of the crowd. A man walking up there would hardly have seen the engine until he got close to the track. * * * When he was hit they were all back on the east side of the walk, away from the track, so that the· train could have a clear way. I do not know how they were when the train was coming in. At the time he was hit they were all back on the east side of the walk, away from the track, so that the train could have a ·clear way."

Roy Knówles, another witness for plaintiff, who was also present at the time of the accident, testified in part as follows:

"I saw the man that was killed just as he was struck by the locomotive, and he was struck by the cowcatcher apparently high up on the limbs. He seemed to try to hold or grasp some part of the cowcatcher, and his feet seemed to be caught on the cowcatcher, and drug him when he fell, on the right side of the cowcatcher. The tender hit him in the back of the head and killed him. When the train came to a stop he was under either the baggage car or mail car. I do not remember having calculated on the speed of the train, except that it was regular until brought to a stop. When it was brought to a stop it was brought to a sudden stop. The train was on Walker street before I knew of it, but from that time until the man was killed and struck [struck and killed] the speed was regular,· practically the same, but when it was brought to a stop it was a sudden stop. I observe the speed of that train from the time it struck the man until the same came to a stop. So far as I could tell there was no change in the speed of the train from the time the engine or pilot crossed Walker street until it hit and killed the man, or from the time the man was first hit or struck by the pilot until he was struck on the back of the head and killed by the back of the tender. The first checking of the speed of the train which I noticed was when it stopped with the baggage or mail car over the man; after the man was killed when the train started to stop, it came to a sudden stop, and had been running about the same speed prior to this sudden stop. As the train came by me, crossing Walker street, and running alongside the station, it was running apparently of its own momentum, or coasting, and was not being operated by steam. As the train came in that morning, it coasted or rolled into the station with such little noise that I was nearly caught by it, and it did not have the usual noise of ·steam exhaust and grinding of brakes or ringing of bells as a train usually comes into the station; there seemed to be no escaping steam or exhaust, no grinding of brakes, no ringing of bell, and no warning of its approach to the station, or crossing at the station. There was a number of cars and trucks lined up between Mr. Emberlin and the train, which kept him from seeing and observing it as it approached, and also a number of people passing. This train passed in two feet of me at the curb just before it struck the man, and I will swear positively that I did not hear any sound of a bell. I did not know the train was

approaching Walker street and the station prior to the accident. I did not know the train was approaching Walker street and the station until the engine was within 2 feet of my car."

John McDonald, another witness for plaintiff, testified as follows:

"As to there being anything to keep Mr. Emberlin from seeing and observing the approaching train, he had his back toward the train; that and the people around there was all that I know of to keep him from seeing it. Immediately prior to the accident Mr. Emberlin was standing with his face to the north, and talking to another man, as I recall it."

According to the testimony of other witnesses introduced by plaintiff, no bell was rung or whistle sounded as the engine approached the station, but no witness testified that the train was traveling at a greater rate of speed than that fixed by plaintiff's witness Lauck, to wit, 4 to 6 miles an hour, nor did any witness contradict the testimony of Lauck and Knowles to the effect that the train was coasting of its own momentum, and was not being operated by steam. The record shows that the conductor of the train did not see the accident, and that H. F. Vaughn was the engineer and L. Bellew was the fireman on the locomotive. The fireman did not testify on the trial, and there is no evidence to show that he discovered the presence of Emberlin before the accident happened. The engineer Vaughn was not introduced as a witness, but certain portions of his depositions taken by the plaintiff were by the plaintiff introduced in evidence. The following were the only answers introduced as to how the accident happened:

"Whether or not I could have stopped the train in time to have kept from killing this man would depend on what condition he was in—what position he was in and various other things that he came in contact with. From the time I saw the man was in danger until I brought my engine to a stop I traveled between 40 and 60 feet, I should judge. When our train came to a stop he was just behind the front baggage car wheels. I traveled between 40 and 60 feet, or something like that, from the time I saw the man was in danger until I brought my engine to a stop. The engine and tank ran about the length of the engine and tank from the time I saw the object coming down until we stopped."

Appellants earnestly insist that the findings of the jury that the deceased did not look or listen to discover the approach of the train, and the testimony set out above, conclusively show that the deceased was guilty of contributory negligence as a proposition of law, to be determined by the court without the aid of the jury, and that such negligence on his part precludes a recovery by plaintiff for the negligence found by the jury in the failure of the operatives of the engine to ring the bell and sound the whistle as it approached the station. Many authorities are cited in support of that contention, while appellee has cited numerous decisions to support the contention that whether or not the deceased was guilty of contributory negligence in failing to discover the approach of the train in time to avoid injury was a question to be determined by the jury. The leading authority relied on by appellants in support of their contention is I. & G. N. Ry. Co. v. Edwards, 100 Tex. 22, 93 S. W. 106. The decision in that case has been often cited with unvarying approval by the same court.

The following from Lee v. I. & G. N. Ry. Co., 89 Tex. 583, 36 S. W. 63, is a clear and succinct statement of the rule applicable in determining the question now under discussion:

"Negligence, whether of the plaintiff or defendant, is generally a question of fact, and becomes a question of law to be decided by the court only when the act done is in violation of some law, or when the facts are undisputed and admit of but one inference regarding the care of the party in doing the act in question; in other words, to authorize the court to take the question from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it."

In all the decisions which we have found holding that it was a question for the jury to determine whether or not a person was negligent in going upon a railway track with unobstructed view of an approaching train, without looking or listening to discover it, there were some special facts or circumstances which, in the opinion of the court, reasonably tended in some measure to excuse such failure.

In Kirksey v. So. Traction Co., 110 Tex. 190, 217 S. W. 139, an automobile which was driven by Kirksey collided with an interurban car on a public crossing, with nothing to obstruct his view. The Supreme Court held that the issue of contributory negligence was for the jury's decision, but stress was laid on the fact that shortly before he reached the crossing his attention was diverted by some one calling to him and requesting a ride in the machine Kirksey was driving, and further cited Mitchum v. Ry. Co., 107 Tex. 34, 173 S. W. 878, as a case having the same extenuating circumstance in it. That distinguishing fact was noted by Presiding Justice McClendon of the Commission of Appeals in his opinion in Ferrell v. Beaumont Traction Co. (Tex. Com. App.) 235 S. W. 531, in which latter case the extenuating circumstance which made the issue of plaintiff's contributory negligence a question to be decided by the jury was the youth of the plaintiff, 15 years of age, who was struck by a passing street car while he was in the act of boarding the automobile upon the invitation of a man who was driving it.

In Moye v. Ry. Co. (Tex. Com. App.) 212

S. W. 471, it was pointed out that the evidence tended to show that the view of the deceased was partially obstructed, and that shortly before the accident the box car which struck him was moving so slowly that the deceased might have been led to believe it was standing still, and that it started suddenly and with considerable speed just as he reached the crossing.

In Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 188, the accident happened on a public crossing in the town of Orange. The train that killed Harrington while he was attempting to pass the crossing was running at a dangerous and reckless speed, to wit, 30 miles an hour, while deceased was traveling 6 or 7 miles per hour. In the opinion those facts were mentioned, and the court said, in substance, that the deceased might have misjudged the speed of the train, or its distance from the crossing when he first observed it, and that it is a matter of common occurrence for persons to cross a railway track in front of an approaching train with knowledge of its approach.

Chiefly on the authority of that decision, this court, in the case of Lancaster v. Browder (Tex. Civ. App.) 243 S. W. 625, held that the question of contributory negligence on the part of the deceased, who was killed by a train which approached her in plain view with a glaring headlight, but at a reckless rate of speed, was for the determination of the jury, since the jury might reasonably infer that she misjudged the speed of the train and its distance from her when she attempted to cross the track. But a writ of error has been granted in that case by the Supreme Court, where it is now pending.

Many decisions by the Courts of Civil Appeals might be cited, in each of which it was held that, by reason of certain circumstances tending to account for the act of the person injured in going upon a railway track while a train in plain view was approaching, the question whether or not he was guilty of contributory negligence was for determination by the jury, such as Hines v. Richardson (Tex. Civ. App.) 232 S. W. 889; Hines v. Arrant (Tex. Civ. App.) 225 S. W. 767. Also the case of Jones v. Ry. Co. (Tex. Com. App.) 243 S. W. 976. But we shall not attempt to recite the facts of those cases, since the same are such as to clearly distinguish the decisions from the case now before us.

In Trochta v. Ry. Co. (Tex. Com. App.) 218 S. W. 1038, judgment was recovered by the widow and children of Joseph Trochta, who was killed by a train while he was driving an empty wagon over a public crossing in the country, and in the opinion of the Commission of Appeals, the following was said:

"The evidence shows that there was a heavy growth of timber in the angle formed by the public road and the railroad, which prevented one approaching the railroad, as deceased was, from seeing a train coming from the east, until he had entered upon the right of way. However, when deceased reached the line of the right of way, about 50 feet distant from the railroad track, he could have seen the approaching train, if he had been looking in that direction, at a distance of 194 yards; and when he had advanced 15 feet further, he could have seen the train a distance of at least a half mile. * * * Upon the issue of contributory negligence, the jury found that before driving upon the crossing deceased did not look, listen, or do any other act to discover the approaching train, but that his failure to do so did not constitute negligence on his part."

The record in that case also showed that the train was running 30 or 35 miles per hour when it struck and killed Trochta, as appears in the opinion of the Court of Civil Appeals, 181 S. W. 761. The Court of Civil Appeals reversed the judgment of the trial court in that case by reason of the conclusion reached that the record showed that deceased was guilty of contributory negligence as a conclusion of law, and that the further finding of defendant's negligence after Trochta's peril was discovered and in time to have avoided killing him was not supported by sufficient testimony. The Commission of Appeals held the contrary on the latter issue, and upon such holding affirmed the judgment of the trial court without discussing the other conclusion reached by the Court of Civil Appeals on the issue of contributory negligence. But Chief Justice Phillips, for the Supreme Court, added this to the opinion of the Commission of Appeals:

"Under the facts of this case there is in our opinion no warrant for not applying * * * the general rule prevailing in this state, that the failure of one about to go over a public railroad crossing to look and listen for an approaching train does not, of itself, constitute negligence as a matter of law. Here, the question as to whether, under all the circumstances, Trochta was guilty of negligence in not looking or listening for the train, was for the jury. The jury determined it against the defendant. For this reason, as well as that announced in the opinion of the Commission of Appeals, the judgment of the Court of Civil Appeals is reversed, and the judgment of the District Court is affirmed."

It thus appears that the Supreme Court were of the opinion that under the peculiar facts of that case the jury could reasonably find that deceased was not guilty of negligence, even though he went upon the crossing without looking or listening or taking any other precautions to discover whether or not a train was approaching.

The case of G., H. & S. A. Ry. v. Price, (Tex. Com. App.) 240 S. W. 524, is one of the most recent decisions of the Supreme Court on the question now under discussion. In that case Mrs. M. S. Price recovered a judgment against the railway company for the death of her husband, caused by being run over by one of defendant's trains at a point

where the railway crossed a public street in the town of Luling, the street running north and south and the railway running east and west and crossing the street at right angles. In the opinion written by Presiding Justice McClendon, of the Commission of Appeals, which was adopted by the Supreme Court, the following facts were recited:

"The train which killed Mr. Price was a freight which had reached Luling a very short while before the accident. It was on the main track, and bound west. In front of the engine was a coal car, and behind the engine a number of box cars. * * * But one witness saw Mr. Price before the train struck him. She was immediately south of the main track on the gravel sidewalk coming north. Her testimony is to the effect that Mr. Price, at the time he approached the crossing, was reading a paper, and that he walked right onto the main track, stepping over the north rail just about the instant the coal car struck him. There was another witness who was some 200 feet in a southwesterly direction from the point of the accident. He did not see Mr. Price until the very moment he was struck by the coal car. He at once ran toward the train, waving his hat and calling to the train crew. He finally attracted the attention of one of the brakemen, who gave a signal to the fireman, and he in turn to the engineer, and the train was then stopped, but not until after it had passed a little beyond a frog situated some 70 feet to the west of the switch target. It appears that Mr. Price's clothes were caught by the cowcatcher of the engine, and he was dragged along the track to this frog, where his body was very badly mutilated. It seems quite clear from the evidence that none of the train crew knew anything about the accident until the brakeman heard the warning referred to. * * * The jury found that defendant's agents in charge of the train were negligent in not ringing the bell, and in that they did not 'keep a lookout ahead of said train, in passing over the public street crossing where it is alleged said W. T. Price was killed, to see that no one was on said crossing and in danger of being injured by said train'; and that if they had done so they could, by the exercise of ordinary care, have discovered him in time to have prevented killing him; and that this negligence was the direct and proximate cause of Mr. Price's death. They also found that Mr. Price was not guilty of contributory negligence. In answer to specific questions they found that Mr. Price did not stop, look, or listen for the train before entering upon the track; that the coal car and engine were moving at the time he entered upon the track; that his view of the train was unobstructed, and that he stepped immediately in front of said car and engine; that the train and engine were not stationary on the street crossing, and did not move forward just prior to the accident. The uncontradicted evidence and the specific findings of the jury present a clear case of a pedestrian stepping in front of a slowly moving train under circumstances which present no excuse for his not discovering it."

By reason of the conclusion reached that the deceased was guilty of contributory negligence as a conclusion of law, which precluded a recovery, the judgments of the trial court and of the Court of Civil Appeals in favor of the plaintiff were reversed, and judgment was rendered in favor of the railway company. In the opinion in that case the leading decisions of our Supreme Court bearing on the question decided, were reviewed at length. After citing Kirksey v. So. Traction Co., 110 Tex. 190, 217 S. W. 139, and Trochta v. Ry. Co. (Tex. Com. App.) 218 S. W. 1038, and Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 138, it was said:

"We do not think it necessary to review the facts in those cases, nor of the many other cases, in which the same doctrine is adhered to. The effect of all of these decisions is the same, namely, that, unless but one reasonable conclusion can be drawn from the evidence, the question whether there has been negligence or contributory negligence is a question of fact to be determined by a jury."

The court then cited many decisions of the Supreme Court and some by the Courts of Civil Appeals, in which writs of error were denied by the Supreme Court, in each of which it was held that there could be no recovery because the person injured, by being struck by a train, was guilty of contributory negligence as a conclusion of law. The opinion embodies quotations made with approval from several of those decisions. One of those quotations from Ry. Co. v. Gaddis (Tex. Com. App.) 208 S. W. 895, is to the effect that all men in possession of their faculties are charged by law with knowledge that it is dangerous to go upon a railway track even at public crossings.

Another quotation from Ry. Co. v. Dean, 76 Tex. 73, 13 S. W. 45, announces the rule to be that, if one heedlessly steps upon a railway track at the very moment of being struck by a passing train, when there is nothing to prevent him from discovering its approach in time to avoid a collision therewith, he is guilty of contributory negligence as a conclusion of law. Other quotations made from Sanches v. Ry. Co., 88 Tex. 117, 30 S. W. 431, Ry. Co. v. Edwards, 100 Tex. 22, 93 S. W. 106, Ry. Co. v. Kauffmann, 46 Tex. Civ. App. 72, 101 S. W. 817, and Ry. Co. v. Ryon, 80 Tex. 59, 15 S. W. 588, all reaffirm the rule as stated in the Sanches Case that—

"Where from the testimony on the issue of negligence no inference but negligence can be drawn, it becomes a question of law and the court may instruct the jury that negligence has been established."

And in the Edwards Case it was held, as a conclusion of law, that the excuse given by Edwards for not looking and listening for the approach of a train before he went on a public crossing, namely, that he relied on the operatives of the locomotive to give the required statutory signals by bell and whistle before reaching the crossing, and which sig-

nals were not given, was, as a conclusion of law, no valid excuse for his rashness. And in that case the Supreme Court reversed a judgment recovered by Edwards in the trial court, and rendered judgment in favor of the railway company.

Likewise, in the Ryon Case, it was said:

"The fact that the deceased was deaf made it all the more negligent to risk his life by standing upon the railway track without exercising his sight to avoid danger from an approaching train. The less ability one has to discover approaching danger the more careful he should be in going within its reach."

And in that case a recovery by plaintiff in the trial court was reversed because of the opinion expressed by the Supreme Court that the evidence conclusively established contributory negligence on the part of the deceased.

[4, 5] As noted already, the jury in the case now before us found that R. L. Emberlin, the deceased, before stepping upon the railway track neither looked nor listened for the approach of the train that killed him. The record also conclusively shows that he did not know of its approach until just as he was struck by the pilot. In the absence of any proof to the contrary, it must be presumed that he was possessed of the same faculties for hearing and seeing, and the same knowledge and experience and ability to appreciate danger which is possessed by an ordinary man of his mature age, namely, 54 years. It was shown by the uncontroverted testimony of plaintiff's own witness, Lauck, that deceased could have seen the approaching train for nearly half a mile just before he stepped upon the east rail of the track where he was struck, and in time to have avoided injury. But one conclusion can be reached to account for his failure to so discover it then, and that is that, without excuse therefor, his mind was upon some other subject than that of keeping a lookout for probable danger of crossing the track, with a knowledge of which danger he was chargeable by law. His inattention to the question of his own safety cannot be explained upon any other probable or reasonable hypothesis, since there is an entire absence of any circumstance to support a contrary conclusion. On principle, this case cannot be distinguished from the Price Case. It is true that in the Price Case the evidence showed that deceased was reading a newspaper while he was crossing the track, but that difference is immaterial, since that merely showed upon what particular matter his mind was fixed, the essential and controlling fact being that the mind of Emberlin, as well as that of Price, was upon some subject other than 'that of exercising ordinary care for his own safety. Of like import are M., K. & T. Ry. v. Martin (Tex. Civ. App.) 44 S. W. 703 (writ of error denied); Bennett v. St. L. S. W. Ry., 36 Tex. Civ. App. 459, 82 S. W. 333 (writ of error denied). Accordingly, we are of the opinion that the undisputed proof, considered in connection with the unchallenged findings of the jury, that deceased, before attempting to cross the track, neither looked nor listened for the approaching train, conclusively established contributory negligence on his part, as a conclusion of law, which barred a recovery on the findings of the jury that appellants were guilty of negligence which was the proximate cause of his death in failing to sound the whistle and bell of the locomotive as it approached the railway station.

[6] Of course, if the judgment could be sustained upon the findings of the jury that the operatives of the locomotive were guilty of negligence which was the proximate cause of the death of Emberlin in not using all means at their command to stop the train after they first discovered his perilous situation, the foregoing conclusion reached by us upon the issue of his contributory negligence would not require a reversal of the judgment. But we have reached the conclusion that the judgment cannot be affirmed on the issue of discovered peril, for the reason that in our opinion the trial court erred in refusing to submit to the jury the issue requested by appellants, reading as follows:

"Did the drive wheels of the engine in question run over and kill said R. L. Emberlin, deceased?"

I. C. Kinney, who was introduced as a witness, testified that he was on the railway platform before the train in question arrived, and was standing there at the time of the accident, and witnessed it. He testified in part as follows:

"Just immediately prior to the time this accident happened I was standing on the platform 4 or 5 feet off the ground. The platform is about 15 feet back from the track, and the time I noticed Emberlin was just a few seconds before the train hit him. I do not know where he came from. I holloed. When I first noticed him he was angling towards the south. He was up towards the crossing more than I was. * * * From where I was standing I had a good view of the place where the accident happened. I had a clear view."

This witness then detailed the manner in which Emberlin was struck, how he tried to catch the cowcatcher when he was first struck, how he then fell to the ground and was run over and killed. He further testified as follows:

"His head went under the first drive wheel, and he rolled out and rolled in again two or three times, it seemed. I noticed his body. * * * The top of his head was taken off. I saw the part of the engine which did that; it was the front drive wheel. After the accident I walked down there to the engine there to see if I was right about it, that that was what did it, and I noticed the crushed skull; crushed skull and skin and some hair on the front

drive wheel; and after that I remembered on one of the wheels some hair and skin stuck to the wheel. He attempted to get out of the way, and in his attempt he tried to grab the cowcatcher. As to him ever getting hold of the cowcatcher, he grabbed the bar, and he missed the step. He grabbed ahold with his hand, and he held that until he turned a somersault. The engine was moving all of the time. The engine did not move far while he was swinging there. It did not move very far until he let go. I don't know how far it moved while he was swinging there, but it was a few feet; it moved several feet. It didn't move 10 or 15 feet while he was hanging on there. I don't know how far it did move, but it was just a few feet—just on right quick * * * I know the first drive wheel hit him. I guess that drive wheel is about 4 or 5 feet behind the pilot beam."

In the absence of actual knowledge by the operatives of the locomotive of Emberlin's peril before his injury, the issue of discovered peril had no application, and the burden was upon the plaintiff to prove such knowledge in time to have enabled them thereafter, by the exercise of ordinary care, to avoid injuring him. Railway Co. v. Breadow, 90 Tex. 27, 36 S. W. 410; Railway v. Staggs, 90 Tex. 458, 39 S. W. 295; Railway v. Shetter, 94 Tex. 196, 59 S. W. 533; Cardwell v. Gulf Ry. Co., 40 Tex. Civ. App. 67, 88 S. W. 422, and other decisions there cited.

Whether the deceased was killed by being run over by the front drive wheel of the engine, as testified by Kinney, or whether he was killed by being struck by the journal box on the rear truck of the tender which followed the engine, was quite material to the defense, since there is an absence of sufficient testimony appearing in this record to show that after the engineer first discovered Emberlin's peril he had time, by the use of all the means at his command, to stop the engine before Emberlin was killed, if it be true that the front drive wheel of the engine killed him. And if the front drive wheel killed him, we do not believe that the finding of the jury on the issue of discovered peril could be sustained. Hence the requested issue was not merely of evidentiary character, and the form in which it was prepared was in accord with the decision in T. & N. O. Ry. v. Harrington (Tex. Com. App.) 235 S. W. 188. While Kinney's testimony upon that point was contradicted by Lauck and other witnesses, still the defendants had the right to an affirmative presentation of the theory of defense predicated upon that testimony. M., K. & T. Ry. v. McGlamory, 89 Tex. 639, 35 S. W. 1058; H. E. & W. T. Ry. v. Lynch (Tex. Civ. App.) 208 S. W. 714; Southern Gas & Gasoline Co. v. Adams & Peters (Tex. Civ. App.) 169 S. W. 1143; C., R. I. & G. Ry. v. Mitchum (Tex. Civ. App.) 194 S. W. 626; G., H. & S. A. Ry. v. Washington, 94 Tex. 517, 63 S. W. 534; St. L. S. W. Ry. v. Hall, 98 Tex. 480, 85 S. W. 786; T.

& N. O. Ry. v. Harrington (Tex. Com. App.) 235 S. W. 188.

[7] No presumption of negligence on the part of the operatives of the locomotive in failing to avoid killing deceased after they, or either of them, discovered his peril, if such discovery was made before he was killed, can be indulged, by reason of the failure of defendants to introduce them as witnesses, since the burden was upon plaintiff to sustain the affirmative of that issue. T. & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; G., H. & S. A. Ry. v. Faber, 77 Tex. 155, 8 S. W. 64. Authorities cited by appellee to sustain a contrary view have no proper application to the question, such as Pullman v. Nelson, 22 Tex. Civ. App. 223, 54 S. W. 624; Burnett v. Anderson (Tex. Civ. App.) 207 S. W. 540; Green v. Scales (Tex. Civ. App.) 219 S. W. 274, etc.

[8] Furthermore, plaintiff took the depositions of the engineer and introduced portions of them, thus, in legal effect, vouching for his credibility as a witness, and that, too, in the absence of any contradiction by any other witness. G., H. & S. A. Ry. v. Faber, 77 Tex. 155, 8 S. W. 64; Providence-Washington Ins. Co. v. Owens (Tex. Civ. App.) 207 S. W. 666; Hines v. Roan (Tex. Civ. App.) 230 S. W. 1071; Cress v. Holloway, 63 Tex. Civ. App. 590, 135 S. W. 210; Western Union Tel. Co. v. Lovely, 29 Tex. Civ. App. 584, 69 S. W. 128.

Whether or not the testimony other than that of Kinney was sufficient to support the finding of the jury on the issue of discovered peril is a question we shall not undertake to determine.

For the reasons noted, the judgment of the trial court will be reversed, and the cause remanded for another trial as between plaintiff and the appellants, without a discussion of other assignments of error presented by both appellants, since the errors pointed out in such assignments, if errors they be, may not occur upon another trial of the case. The judgment in favor of the St. Louis, San Francisco & Texas Railway Company, of which no complaint is made, will be left undisturbed.

On Motion for Rehearing.

The decision of the Commission of Appeals in Barron v. H. E. & W. T. Ry. Co. (Tex. Com. App.) 249 S. W. 825, has been published since our decision in the present suit on original hearing. Appellee cites that case, and urgently insists that it supports her contention that we erred in holding, as a conclusion of law, that the record establishes negligence on the part of Emberlin which proximately contributed to his death, notwithstanding the contrary finding of the jury on that issue. We believe that contention is unsound, since the facts recited in the opinion of Justice Powell, which was adopted by the Supreme Court, clearly distinguish it from the case at bar.

That was a suit by Barron to recover for injuries sustained by him by being struck by one of the railway company's box cars while the train was being switched in the railway yards in the town of Nacogdoches, and the features which distinguish it from the present suit appear from the following excerpt from the opinion:

"In the first place, Barron crossed this house track twice, the latter time about half a minute after the first crossing, and the second crossing of it being only some 90 or 100 feet north of his first crossing of it. When he turned west, and crossed it the first time, he exercised his senses and located the freight train which he knew to be in the yards south of him. He found it at that time engaged in switching cars off on to the first side track west of the main line. He evidently decided that he could cross the house track in safety at that time. He then turned north, going some 90 or 100 feet, when he turned east across the house track and was almost immediately struck. It seems the cars which struck him were in 8 or 10 feet of him on the house track when he entered upon it. But, after he first crossed the house track, and as he walked north, he watched the cars rolling down on the track west of the main line. The jury might well have decided that, seeing these cars switching on his west, he was justified in concluding that there would be no cars practically upon him on the house track. In other words, the care exercised by Barron in looking for cars as he first crossed the house track and his further action in keeping his eyes on the cars being kicked onto the track west of the main line might have constituted such a course of conduct, in the view of some reasonable minds, as a reasonably prudent person would have adopted for his safety at the time in question. We are not prepared to say that Barron, as a matter of law, did not act for his own safety as a reasonably prudent man would have done. This is far from being a case where a man at no point in his approach to a railroad exercises any care for his own safety."

The decision in the case of M., K. & T. Ry. v. Merchant (Tex. Com. App.) 231 S. W. 327, also stressed by appellee, is likewise distinguishable from the case at bar, in that in that case the Commission of Appeals held that the testimony was sufficient to support the finding by the jury that Merchant looked for an approaching train before he drove his loaded truck on the railway crossing where he was killed by a passing train, and that he did not necessarily know of its approach, and further held that it did not conclusively appear that he began racing with the train before he reached the crossing, as contended by the railway company. The jury further found that before going on the crossing Merchant listened for a train.

It is again insisted that the requested issue of appellant, which was refused by the court, to wit, "Did the drive wheel of the engine in question run over and kill R. M. Emberlin, deceased?" and the refusal of which issue we have held was error, was merely evidentiary in its character, and did not properly constitute an issue to be submitted to the jury, and, further, that we were in error in holding that there is an absence of sufficient testimony in the record to show that after the engineer first discovered Emberlin's peril he had time, by the use of all the means at his command, to stop the engine before Emberlin was killed, if it be true that the front drive wheel of the engine killed him.

[9] As pointed out in our original opinion, the burden was on the plaintiff to show by a preponderance of evidence her right to recover upon the theory of discovered peril. In order to discharge that burden, it was necessary to establish two facts: First, that Emberlin's peril was discovered by the operatives of the engine before he was killed; and, second, that such discovery was made in time to have enabled the operatives to avoid killing him by stopping the engine before he was struck. If it be true, as testified by I. C. Kinney, and also by another witness, F. M. McLain, that the front drive wheel of the engine struck and killed Emberlin, then it was incumbent upon plaintiff to show that the operatives of the engine discovered his peril in time to have avoided killing him by stopping the engine before he was so struck. It is true that such proof may consist, in part, at least, of circumstantial evidence, but such evidence must be of facts, not merely inferences or presumptions. For illustration, it cannot be presumed that because it was his legal duty to exercise ordinary care to keep a proper lookout ahead the engineer saw Emberlin at the time he was struck by the pilot, or when he stepped upon the track in front of the engine, but it was necessary to show when, in fact, he did discover Emberlin's peril, and that after seeing him he had time to avoid killing him by the use of means at his command, and in the exercise of ordinary care. The only evidence introduced to show when the engineer did discover Emberlin's peril was that contained in the depositions of the engineer himself, taken by plaintiff, and the following answers of that witness were introduced by the plaintiff, and was the only testimony given by him relative to the time he first made such discovery:

"When he was lying on the ground after he was killed, I judge he was about 10 feet down the track from the place I first saw him. * * * From the time I saw the man was in danger until I brought my engine to a stop I traveled between 40 and 60 feet, I should judge. When our train came to a stop he was just behind the front baggage wheels. * * * The engine and tank ran about the length of the engine and tank from the time I saw the object coming down until we stopped."

Plaintiff's witness Lauck testified that after deceased was struck by the pilot the engine traveled between 80 and 100 feet before it came to a stop. Plaintiff's witness Roy Knowles testified:

"The tender hit him in the back of the head and killed him. When the train came to a stop he was under either the baggage car or mail car."

It was shown by other testimony without controversy that when the deceased was first struck he grabbed hold of the pilot and held to it until the engine had traveled several feet, and then fell to the ground, where he was struck and killed. It cannot be determined from the engineer's testimony whether the "coming down" of the deceased was when he was first struck by the pilot or when he fell therefrom later. The testimony of witness Kinney that in his opinion the front drive wheel of the engine was about 4 or 5 feet behind the pilot beam seems not to have been contradicted by any other testimony. Even though Lauck's testimony that the train only traveled from 4 to 5 feet after the brakes were applied be accepted as true, there is still a lack of testimony from any witness as to how far the engineer was from the air brake when he discovered Emberlin, or what length of time would be required for him to apply the brakes.

[10] At all events, the appellant had the right to the submission of the requested issue as to whether or not Emberlin was killed by being struck by the front drive wheel of the engine rather than by being struck by the journal box of the baggage car, as testified to by several of plaintiff's witnesses, and upon whose testimony plaintiff relied to sustain her right of recovery on the issue of discovered peril. And that defense was admissible under appellant's general denial without the necessity of specially pleading it.

The motion for rehearing is overruled.